UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

DELA YADOR,

                 Plaintiff,          **MEMORANDUM & ORDER**
                                         19-CV-4128 (EK)(RML)

          -against-

JASON MOWATT,

                 Defendant.

------------------------------------x
ERIC KOMITEE, United States District Judge:

        Plaintiff Dela Yador and defendant Jason Mowatt worked together, for a time, on an entertainment business.  The operation sold tickets to parties at which patrons could listen to music, eat and drink, and also rap or sing along with hit rap and R&B songs.  They called the business Trap Karaoke.

        Ultimately, Mowatt and Yador separated.  Yador sued, alleging that he was an equity stakeholder in the venture, and that Mowatt improperly froze him out.  The facts underlying this dispute are set forth in prior orders, and the court assumes familiarity with them.[1]

------------------------

[1] Given the complexities of this case, in September 2021 the Court requested the appointment of *pro bono* counsel for Yador.  ECF No. 25, at 16 n. 2.  Counsel from Davis Polk & Wardell LLP – including Tess Liegeois, Kathryn Bi, Christina Costello, Alec Fisher, Amelia Starr, Danielle Mullery, Dara Sheinfeld, Micayla Hardisty, Matthew Garry, and Michael Haney – have appeared to brief and / or argue this case on behalf of the plaintiff.  Counsel have ably discharged their duties, and the Court thanks them for their service.  *See generally Green v. Brennan*, 578 U.S. 547, 552 (2016) (expressing the Court's thanks to appointed counsel).

Defendant has now moved for summary judgment on all claims, and also to preclude testimony by the plaintiff's valuation expert.  For the reasons that follow, those motions are DENIED except as to the complaint's fourth cause of action, which is dismissed as duplicative.

## I.   Discussion

### A.   First Through Third Causes of Action

Defendant Mowatt seeks summary judgment on the plaintiff's first three causes of action — breach of the partnership agreement, breach of the duty of loyalty, and breach of fiduciary duty.  Mowatt makes the same argument in opposing each of these claims: that a partnership was never formed — or, alternatively, that it was terminated prior to the events constituting the alleged breach.[2]  The record, however, is replete with "admissible evidence sufficient to raise a genuine dispute of fact for trial" on the existence and alleged termination of a partnership, and these issues are therefore not

---

[2] Mowatt also requests summary judgment on the plaintiff's sixth cause of action — injunctive relief — on the same basis.  Yador abandons that claim in his opposition papers.  Plaintiff's Opposition Memorandum ("Pl.'s Opp. Mem.") at 12 n.4, ECF No. 81-15.  The claim is therefore dismissed with prejudice.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) ("[S]ummary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims.").

amenable to decision at this stage.  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).[3]

1.  Genuine Disputes Exist with Respect to Partnership Formation

Plaintiff claims that he and Mowatt entered into a partnership, and that Mowatt violated the partnership agreement by failing to share the profits of the enterprise.  The parties had no written agreement, but in New York, partnership agreements can be written, oral, or implied-in-fact.  The factors going to the existence of an implied-in-fact partnership are: "(1) the parties' intent, whether express or implied; (2) whether there was joint control and management of the business; (3) whether the parties shared both profits and losses; and (4) whether the parties combined their property, skill, or knowledge."  *Hammond v. Smith*, 151 A.D.3d 1896, 1897 (4th Dep't 2017).  "No single factor is determinative; a court considers the parties' relationship as a whole."  *Id.*

The record on summary judgment contains more than sufficient evidence on each factor to establish a genuine dispute of fact.  Among other things, the record reveals indications that Mowatt regularly referred to Yador — privately

---

[3] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

and publicly — as his partner (speaking to intent)[4]; they regularly conferred on budgeting and hiring (management and control)[5]; and both contributed funds and industry knowledge to the business (combined skills, property and knowledge).[6]

Mowatt trains most of his analytical fire on the argument that the two did not agree to share profits and losses, but the record contains sufficient evidence from which a jury *could* reasonably disagree. Among other things, there is the text chain in which Yador asked Mowatt, regarding profits from events, "And do we split even?? I know you put out a lot so I'm def cool with taking less." Pl.'s Exh. 8 at 16, ECF No. 81-24. Mowatt responded, "i'm down to split it even." *Id.* A jury might reasonably view this exchange as "a mutual promise or undertaking of the parties to share in the profits of the business." *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317 (1958).

Mowatt also sent Yador a series of messages explaining how "*we* can cut the costs going forward" — for example, by cutting out the videographer and limiting expenses for some other event workers. Pl.'s Exh. 8 at 16, ECF No. 81-24. This

---

[4] *E.g.*, Plaintiff's Exhibits ("Pl.'s Exhs."), ECF Nos. 81-16-48, Exh. 4 at 6; Exh. 16 at 3; Exh. 18 at 5.

[5] *See, e.g.*, *id.* at Exh. 8 at 12, 18-19.

[6] *E.g.*, Mowatt Deposition Transcript ("Mowatt Dep. Tr.") at 115:8-116:8, ECF No. 22 (Exh. 6) (describing Yador's contributions to the business, including that he made introductions to venues, acted as a "sounding board," and collaborated with Mowatt to create set lists).

conversation may be most naturally understood as a conversation between equity partners — if Yador was only a contractor, he would have had less reason to care about cutting costs (and the costs would not be joint, in any event — there would be no "we"). *See Napoli v. 243 Glen Cove Avenue Grimaldi, Inc.*, 397 F. Supp. 3d 249, 269-70 (E.D.N.Y. 2019) (divining intent to form joint venture from the parties having "demonstrated an understanding that they would share in the losses as well" as profits).

This exchange occurred after Mowatt had informed Yador that he could make Yador whole on his $600 cash outlay for the first event *because* the event had made $1,228 in online sales. *Id.* Again, a jury might also reasonably view the suggestion that Yador's right to this distribution was contingent on the event's profitability as consistent with joint ownership. *Cf. Steinbeck*, 4 N.Y.2d at 317 (declining to find joint ownership because the plaintiff's profits were not contingent upon the overall profitability of the enterprise).[7]

---

[7] It may have been only natural that the parties would be less explicit about loss-sharing than profit-sharing, given that the business was profitable within months of inception. *See* Pl.'s Exh. 14 at 2, ECF No. 84-4 (showing net income of $2,893.86 for 2015); Pl.'s Exh. 8 at 16 (Mowatt noting Trap Karaoke's first two events "should put us in the green").

2.   Genuine Disputes Persist with Respect to Whether, and
     When, the Partnership Terminated

Mowatt argues that even if the two men formed a
partnership, it terminated upon the formation of Trap Karaoke,
LLC on December 24, 2015.  Defendant's Memorandum ("Def. Mem."),
ECF No. 81-2, at 23.  He invokes *Weisman v. Awnair Corp. of Am.*,
3 N.Y.2d 444, 449 (N.Y. 1957) and *Nasso v. Seagal*, 263 F. Supp.
2d 596, 618 (E.D.N.Y. 2003), for the proposition that the
formation of a corporation to carry out business formerly
carried out by a partnership necessarily terminates the
partnership.  *See* Def. Mem. at 24-25.

But *Weisman* and *Nasso* are distinguishable: in both,
the parties *mutually* agreed to substitute the corporate form for
a preexisting joint venture.  *See Weisman*, 3 N.Y.2d at 449
("[W]hat is pleaded is an agreement between plaintiff Weisman
*and* the individual defendants to conduct a business enterprise
as joint venturers through the instrumentality of a
corporation.") (emphasis added); *Nasso*, 263 F. Supp. 2d at 618
(holding that "when parties" — plural — "form a corporation to
carry out the business of the partnership, they cease to be
partners").  In that context, the courts said that the parties
cannot have it both ways — that they could not agree to be a
joint venture vis-à-vis one another, but "a corporation as to
the rest of the world." *Weisman*, 3 N.Y.2d at 449.

Here, it is Mowatt's own position that he *and Yador* agreed to nothing with respect to the substitution of the LLC for any preexisting partnership.  Moreover, it is of course not the case that the formation of *any* new LLC must effectuate the termination of a preexisting partnership.  *See Sagamore Corp. v. Diamond W. Energy Corp.*, 806 F.2d 373, 378 (2d Cir. 1986) (holding that *Weisman* "has been limited by subsequent New York decisions" and the corporate form does not "legally supplant[] the venture . . . when the corporation is a mere adjunct of a joint venture").  There are myriad ways in which entrepreneurs can operate through multiple entities.  The plaintiff's position is that the LLC, when it came into existence, was partnership property, and New York law plainly permits single-member ownership of an LLC by a partnership.  *See id.*; *see generally Bartenwerfer v. Buckley*, 598 U.S. 69, 82 (2023) ("Partnerships and other businesses can also organize as limited-liability entities.").  A jury might reasonably find as much on the existing record.

Finally, New York law requires that the termination of an at-will partnership occur via an "unequivocal" manifestation of the election to terminate.  *Scholastic, Inc. v. Harris*, 259 F.3d 73, 87 (2d Cir. 2001) (citing *Cracco v. Cracco*, 25 A.D.2d 660, 660 (2d Dep't 1966)).  And the record on summary judgment reveals — among other things — that Mowatt referred to Yador as

his "partner" *after* the LLC's formation.  Pl.'s Exh. 4, at 6
(Mowatt sent a text in 2016 saying that "Dela [Yador] is my
business partner on trap karaoke").  Mowatt also texted the Trap
Karaoke tour manager as late as 2017 to ask her to "look into
how I can convert an LLC from a partnership into a sole
proprietorship," suggesting that even then he considered the LLC
to be under his and Yador's joint control.  *Id.* at 3.  Thus
this, too, is a question for a jury to resolve.

Mowatt's arguments for dismissing the second and third
causes of action — breach of the duty of loyalty and breach of
fiduciary duty — depend on his argument that the parties never
formed, or otherwise terminated, the partnership.  *See* Def. Mem.
at 16 n.2 ("The Second and Third Causes of Action allege breach
of fiduciary duties that arise out of and are owed under a
partnership.").  These arguments therefore fail as well.

## B.   Fourth Cause of Action: The Implied Covenant of Good Faith and Fair Dealing

In Yador's fourth cause of action, he alleges that
even if no provision of the partnership agreement prohibited
Mowatt's conduct, the implied covenant of good faith and fair
dealing — implicit in every New York contract — did.  Mowatt's
argument that this claim should be dismissed due to the lack of
a partnership contract is unavailing for the reasons set forth
in the preceding section.  But Mowatt also argues, in the

alternative, that the implied-covenant claim should be dismissed because — as framed in the operative complaint — it is duplicative of Yador's breach of contract claim.  New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 75, 81 (2d Cir. 2002).

Yador cites *360 N. Rodeo Drive LP v. Wells Fargo Bank, N.A.* for the proposition that his implied covenant claim "is not duplicative when the claim depends on other facts *in addition to those* that might support a breach of contract claim."  No. 22-CV-767, 2023 WL 2574180, at *6 (S.D.N.Y. Mar. 20, 2023).  In *360 N. Rodeo*, which concerned recovery under a loan agreement, the court found that the two claims were sufficiently distinct to avoid dismissal.  While the breach of contract claim turned on "Defendants' unjustified attempt to charge default interest when there was no contractual justification for the same," the implied covenant claim turned instead "on Defendants' duty to provide accurate statements as to any charges or fees Defendants sought to assess."  *Id.* at *7.

Here, Yador offers only the fact that "Defendant acted deceptively" in the course of the breach of the partnership agreement as the "other fact" supporting his implied covenant

claim. Pl.'s Opp. Mem. at 26. Specifically, Yador directs the Court's attention to the fact that Mowatt "sat for interviews during the Parties' partnership, describing himself as the sole creator of Trap Karaoke, and then assured Plaintiff it was a mistake and that he would get a correction, when he had no intention of doing so." *Id.* at 27. But Yador relies on those same facts to prove his claim for breach of the partnership. For example, Yador alleges that Mowatt breached the partnership agreement by "deliberately engag[ing] in a scheme and course of conduct to confuse the public as to Trap Karaoke's true origin and owners." Second Amended Complaint ("SAC") ¶ 64, ECF No. 52.

Additionally, as Mowatt points out, "New York's Partnership Law creates default provisions that fill gaps in partnership agreements." *Congel v. Malfitano*, 31 N.Y.3d 272, 279 (2018). Those default provisions include a duty — pursuant to the partnership contract itself — for partners to "render on demand true and full information of all things affecting the partnership to any partner." N.Y. P'ship Law § 42 (McKinney 2024). It also includes a fiduciary duty to the partnership. *Id.* § 43. As Yador's implied covenant claim is premised on evidence that Mowatt lied to Yador about the nature of the LLC and his rights over it, the claim is subsumed by Yador's rights under the partnership contract itself, and therefore

duplicative.  Plaintiff's fourth cause of action is thus
dismissed.

## C.   **Fifth Cause of Action: Unjust Enrichment**

New York law is clear that a plaintiff cannot pursue a
claim for unjust enrichment for conduct covered by a contract
term.  *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d
382, 388 (1987).  But one can plead unjust enrichment in the
alternative, as Yador has done here.  *Auguston v. Spry*, 282
A.D.2d 489, 491 (2d Dep't 2001); *see Grossman v. GEICO Casualty
Co.*, No. 21-2789, 2022 WL 1656593, at *3 (2d Cir. 2022)
(pleading unjust enrichment in the alternative is appropriate
"where there is a dispute over the existence, scope, or
enforceability of the putative contract").  And the record is,
once again, replete with evidence that Yador worked with Mowatt
to build the company; if he was not a partner or co-LLC member,
then a jury could reasonably conclude — based on this evidence —
that Mowatt was unjustly enriched by Yador's efforts.[8]

Mowatt responds that Yador should not be allowed to
pursue this theory because the record reveals "no evidence" from

_____

[8] Mowatt argues that this theory — that he unjustly profited from
Yador's contribution of time and effort — is unpled in the operative
complaint.  *See* Defendant's Reply Memorandum ("Def. Rep. Mem.") at 15, ECF
No. 81-50.  He reads the complaint to assert enrichment only for his use of
Yador's *idea* for the business.  *See id.*  That is not, however, a fair
reading.  In a section titled "Plaintiff's Harm," Yador alleges that he
"spent untold time and personal resources to bring the Partnership's idea of
'Trap Karaoke' to life."  SAC ¶ 33.  He goes on to allege that Mowatt was
"unjustly enriched by the[] usurping of the partnerships' idea *and profits*."

which a jury could calculate Yador's damages (*i.e.*, the value of his services).  Def. Mem. at 33-34.  But Yador can overcome the motion for summary judgment by showing evidence sufficient for a jury to side with him on each *element* of his claims.  *See Jaramillo*, 536 F.3d at 145.  And the elements of unjust enrichment require Yador to show only that he was damaged — not that he was damaged in a specific amount.  *See Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) ("To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.").[9]

D.   **Seventh and Eighth Causes of Action: Fraud**

Yador brings two claims for common-law fraud.  In the complaint's seventh cause of action, he alleges that Mowatt falsely assured him that he (Yador) would be a member of the new LLC.  SAC ¶ 99.  His eighth cause of action alleges that Mowatt

---

*Id.* at ¶ 62 (emphasis added); *see also id.* at ¶¶ 48, 55, and 102-03 (all referring to the uncompensated investment of Yador's time).

[9] At oral argument, Mowatt contended that Yador violated Rule 26 by omitting to produce a computation of his unjust-enrichment damages in discovery.  This issue is not properly before the court at this stage, given Mowatt's omission to brief it beyond a passing reference in his reply brief. Def. Rep. Mem. at 15 (not citing Rule 26, but arguing that Yador "fails to put forth any evidence as to the value of his time, effort and uncompensated labor"); *see Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n.5 (2d Cir. 2006) ("[W]e generally do not consider arguments that are raised for the first time in a reply brief."), *accord Patterson v. Balsamico*, 440 F.3d 104, 113 n.5 (2d Cir. 2006) ("The Court generally will not consider arguments raised for the first time in a reply brief.").

falsely stated that he would be a registered owner of the Trap Karaoke trademark. *Id.* at ¶ 106.

Mowatt seeks summary judgment on both claims, on two alternative bases. First, Mowatt argues that Yador has failed to produce evidence of an out-of-pocket loss and therefore cannot satisfy the damages element of a New York fraud claim. And second, Mowatt argues that Yador cannot show reasonable reliance on the alleged misrepresentations, because the true facts concerning the LLC and the trademark registration were publicly available.[10]   Neither argument suffices to merit summary judgment.

1.   Injury Due to Fraud

To recover for fraud in New York, a plaintiff must prove "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996).  Mowatt argues

---

[10] Specifically, Mowatt argues that Yador could have obtained the LLC's articles of incorporation — which showed that Yador was not a member — from the New York Department of State.  Def. Mem. at 39-40; Def. Rep. Mem. at 18-19.  And he argues that Yador could have obtained the trademark registration — which showed that Yador was not a registered holder — with the Patent and Trademark Office.  Def. Mem. at 40; Def. Rep. Mem. at 18-19.

that Yador has adduced insufficient evidence of the last
element.

New York courts calculate damages for fraud based on
"the actual pecuniary loss sustained as the direct result of the
wrong," rather than allowing "recovery of profits which would
have been realized in the absence of fraud." *Id.* This is known
as the "out-of-pocket rule." *Id.*

Mowatt argues that Yador has not produced any evidence
of recoverable damages under the out-of-pocket rule. But he
also acknowledges that Yador has produced evidence of
"unreimbursed travel expenses totaling $88.66," which
constitutes an out-of-pocket loss. Def. Mem. at 38.[11] Under New
York law, "fraud from which flows even nominal damage has been
held actionable." *Cooke v. Colman*, 269 N.Y.S. 21, 23 (1st Dep't
1934).[12]

As with his arguments on unjust enrichment, Mowatt's
argument goes not to whether Yador has raised a genuine dispute

---

[11] The parties also dispute whether the value of Yador's in-kind
contributions — mainly his time and effort — can qualify as out-of-pocket
losses here. Given the evidence that Yador expended money out-of-pocket, we
need not resolve this issue at this stage.

[12] Mowatt frames Yador's reliance on the $88.66 as an attempt to "amend
his pleadings in a summary judgment opposition." *See* Def. Rep. Mem. at 17.
This is not a fair reading of the record; Yador invoked his out-of-pocket
financial expenditures in the pleadings. *See, e.g.*, SAC ¶ 103 ("Plaintiff
further invested *money*, time, and resources into Trap Karaoke that he would
not have invested but for Defendant's fraud.") (emphasis added); *id.* ¶ 102
("Plaintiff would not have continued to . . . incur expenses for . . . Trap
Karaoke . . . had he known Defendant intended to exclude him from the LLC.").

as to the *element* at issue — here, injury — but only to the *amount* of damages available.  As the Second Circuit has explained, however, the purpose of the out-of-pocket rule is not to require up-front calculations of damages.  Instead, it is to "regulate which types of injuries must be shown to constitute a tort." *AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 F. App'x 2, 4-5 (2d Cir. 2016) (citing *Starr Found. v. AIG, Inc.*, 76 A.D.3d 25, 28 (1st Dep't 2010)).  Here, Yador has adduced sufficient evidence of out-of-pocket injury at this stage.

> 2.   Publicly Available Information

To recover for fraud based on a misrepresentation or material omission, New York law requires that the plaintiff "suffered injury as a result of justifiable reliance" upon the misrepresentation or omission.  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 784 (2d Cir. 2003).  That requirement — also termed the "reasonable reliance element" — "is focused on whether it was foolish or not for the plaintiff to believe the defendant's fraudulent statement." *Lugones v. Pete and Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 243 (S.D.N.Y. 2020) (citing *Banque Franco-Hellenique de Commerce Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22, 26 (2d Cir. 1997)).

In a classic application of this rule, the Appellate Division affirmed a grant of summary judgment in *Alpha GmbH & Co. Schiffsbesitz KG v. BIP Indus. Co.*, 25 A.D.3d 344, 345 (1st

Dep't 2006).  There, the parties were business entities on opposite sides of an arm's length transaction.  Neither party claimed a confidential or fiduciary relationship.  And both sides were represented by their own counsel.  Summary judgment was appropriate, in those circumstances, because the information that was allegedly concealed related to matters of public record that could have been discovered by the exercise of ordinary diligence.  *Id.*

But the rule is not absolute; as the Second Circuit has observed, New York does not require that information "be available only to the defendant and absolutely unknowable by the plaintiff before reliance can be deemed justified." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 n.9 (2d Cir. 1997); *see also Todd v. Pearl Woods*, 20 A.D.2d 911, 911, (2d Dep't 1964) (holding that where "the facts were peculiarly within the knowledge of the defendants and were willfully misrepresented, the failure of the plaintiffs to ascertain the truth by inspecting the public records is not fatal to their action"), *aff'd*, 15 N.Y.2d 817 (1965).

So, in assessing reasonable reliance, "New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *J.P. Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004).

In this assessment, "beneficiaries of [a] fiduciary relationship" are "entitled to rely on [the fiduciary's] representations and his complete, undivided loyalty"; thus they are not, generally speaking, "required to perform independent inquiries." *Frame v. Maynard*, 922 N.Y.S.2d 48, 51 (1st Dep't 2011).

Mowatt maintains that his alleged misrepresentations could have been discovered through ordinary diligence. Def. Mem. at 40. For example, Mowatt argues that Yador could have sought out the application he filed with the United States Patent and Trademark Office, which lists Mowatt (and not Yador) as an owner of the Trap Karaoke mark. *Id.*; *see* TRAP KARAOKE, Registration No. 5,121,354, United States Patent and Trademark Office.[13] But given the New York standard, this is a question for a jury on the instant record. Unlike the factors in play in *Alpha GmbH*, for example, Yador is an individual rather than a business entity; he was unrepresented in his dealings with Mowatt; and he alleges a fiduciary relationship between the two. He has also adduced sufficient evidence for a jury to conclude that Mowatt made "willful" misrepresentations, per the Second Department's decision in *Todd*, *supra.*

---

[13] "[T]he Court may take judicial notice of official records of the United States Patent and Trademark Office." *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 345 (S.D.N.Y. 2014).

Lastly, the facts alleged to have been misrepresented were within Mowatt's purview and not Yador's, as Mowatt filed the paperwork to create the LLC and the application to trademark the name Trap Karaoke.  Pl.'s Exh. 3, ECF No. 81-19, at 22.  Thus, a genuine dispute persists as to whether Yador reasonably relied on Mowatt's statements.  These remaining "[q]uestions of the reasonableness of reliance raise issues of fact that must be resolved at trial."  *MTV Networks v. Curry*, 867 F. Supp. 202, 207 (S.D.N.Y. 1994).

**E.    Defendant's *Daubert* Motion**

In addition to his motion for summary judgment, Mowatt moves to preclude (in part) the testimony of Yador's valuation expert, Jeffrey Hart.  Hart's report estimates Yador's potential damages.  Hart's Expert Report ("Hart Report") ¶ 22, ECF No. 84-5.  Hart used a discounted cash flow (DCF) model to forecast the value of Yador's share of the partnership as it would have been assessed in 2017 and 2019.  Hart Report, ¶¶ 27-28.[14]

A DCF analysis incorporates two key inputs: (1) a "forecast[] of expected revenues" over a discrete period of time (here, five years), and (2) the "value of the company beyond the discrete period" — i.e., the "terminal value" — which is based

---

[14] Yador sees 2017 and 2019 as the relevant valuation dates because those are the years in which Yador alleges that the Trap Karaoke partnership was breached (by Mowatt) and that he filed this suit.  Pl.'s Opp. Mem. at 32.

on a longer-term cash-flow estimate. *Id.* ¶ 70. Mowatt's objections generally refer to the first input.

To forecast Trap Karaoke's then-expected revenues over five-year periods beginning in 2017 and 2019, Hart relied on (1) Trap Karaoke's historical financials leading up to those periods, (2) Trap Karaoke's management's expectations for its growth potential at the time, and (3) the growth and performance of two more mature, but otherwise assertedly comparable, companies: D'ussé Palooza and Grits & Biscuits. *Id.* ¶ 73. Hart explains that he needed to use comparable company data, rather than Trap Karaoke's own revenue projections, because Trap Karaoke made no projections of forward revenue. *Id.* ¶ 72. Mowatt criticizes the process by which Hart selected the "comparable" companies, as well as certain inferences Hart drew from material provided by those companies' founders.

Hart used estimates of historical data from the comparable companies to project Trap Karaoke's revenue growth at comparable stages (e.g., the year-over-year increase in D'Ussé's third-year revenues would correlate with Trap Karaoke's third year). *Id.* ¶ 75. Combining those projections with actual data for Trap Karaoke's expenses and other liabilities, Hart arrived at "an estimate of [Trap Karaoke's] unlevered free cash flow," to which he applied a discount rate. *Id.* ¶ 71. These calculations yielded two net present values — estimates of what

a buyer would have paid for the business at the two valuation dates. *Id.* ¶ 106.

Mowatt does not question the reliability of the DCF methodology. Instead, he objects to three aspects of Hart's process, all relating to his use of D'ussé Palooza and Grits & Biscuit's audience growth to estimate Trap Karaoke's revenue growth. First, he argues that Hart "cherrypicked" those companies as comparators rather than employing a more objective selection process. Second, he argues that Hart lacked a sufficient basis for his assumption that estimates of the companies' ticket sales could be used to estimate their revenue growth. And third, he argues that Hart had insufficient data from which to estimate Grits & Biscuits' actual audience growth.

*Selection of Comparable Companies.* In selecting D'ussé Palooza and Grits & Biscuits as comparators, Hart relied on his own research into those companies' business models as well as testimony from Mowatt himself. The two comparable company founders provided data including their events' average ticket prices, the size of their shows, the relationship between revenue and ticket sales, and how their margins changed over time. *See* Hart Report ¶¶ 53-54; *see also* Benner Hall Declaration, ECF No. 81-12; Erika Lewis Declaration, ECF No. 81-13.

Mowatt objects that Hart "cherrypicked" these companies as comps rather than employing a "survey or some other independent [selection] process."  Def. Mem. at 42; *see generally In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004) ("[A]n expert may not pick and choose from the scientific landscape and present the Court with what he believes the final picture looks like.").  Cherry-picking constitutes "a form of [r]esult-driven analysis, which undermines principles of the scientific method."  *Daniels-Feasel v. Forest Pharms., Inc.*, 2021 WL 4037820, at *5 (S.D.N.Y. Sept. 3, 2021) (citing *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No. II) MDL 2502*, 892 F.3d 624, 634 (4th Cir. 2018) (affirming district court's exclusion, under *Daubert*, of testimony of epidemiologist who included favorable test results in his report and excluded unfavorable results)).

Hart testified about his selection process.  He explained that in the course of his market research, he asked plaintiff's counsel about the discovery in this case: specifically, "whether anything existed in the record" — including witness testimony — "that would point us to comparable companies."  Hart Deposition ("Hart Dep."), ECF No. 81-10, at

228:23-229:9.  In this way, he learned of Mowatt's own
assessment that these two companies were in the same space.[15]

Mowatt's objection falls short because "any selection
of comparable companies is inherently the product of expert
judgment," and the record does not indicate that Hart's judgment
was biased or otherwise flawed.  *See Manbro Energy Corp. v.
Chatterjee Advisors, LLC*, No. 20-CV-3773, 2022 WL 4225543, *9
(S.D.N.Y. Sept. 13, 2022).  And there is nothing inherently
improper about Hart's reliance on the parties and the record.
*See, e.g.*, *Lickteig v. Cerberus Capital Mgmt., L.P.*, 589 F.
Supp. 3d 302, 334 (S.D.N.Y. 2022).  In the end, Mowatt does not
explain how the survey or other "independent process" he
envisions would have worked.  His objection to Hart's selection
of these particular companies — and any potential disanalogies
between them and Trap Karaoke — ultimately goes to the weight of
his testimony, not its admissibility.

*Using Ticket Sales to Approximate Revenue Growth.*
Mowatt also challenges Hart's assumption that the comparator
companies' ticket sales would correlate with revenue growth.

---

[15] *See* Mowatt Dep. Tr. at 90:19-91:1.  When asked "[w]hat businesses
were similar to Trap Karaoke in 2015," Mowatt pointed to Grits & Biscuits and
Henry Palooza (D'ussé Palooza's former name).  *Id.* at 90:19-91:1.  He
acknowledged that both companies were similar in that they tour "multiple
cities" and "probably have a similar audience," but maintained that Grits &
Biscuits events take a different "format" (without explaining how) and that
D'ussé Palooza events were daytime events, unlike Trap Karaoke's.  *Id.* at
91:10-24.

But D'ussé Palooza's founder supported this assumption explicitly, attesting that his company's "revenue increased in proportion to ticket sales."  Hart Report ¶ 53.  Certainly, Hart's assumption was not "so unrealistic and contradictory as to suggest bad faith."  *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017).  It is only logical to expect that a business's revenue would correlate with demand for its core product.  Thus, Mowatt's "contentions that the assumptions are unfounded go the weight, not the admissibility, of the testimony."  *Id.; see also Prob. Ct. of City of Warwick ex rel. Lawton v. Bank of Am. Corp.*, No. 7-CV-239, 2010 WL 1508922, *5 (D.R.I. Apr. 4, 2010) (explaining that "accepted valuation techniques obligate an expert to make a variety of simplifications, assumptions, and estimates based on reasoned judgment and professional training").

        *Grits & Biscuits' Data.*  Finally, Mowatt argues that Hart lacked sufficient audience data for Grits & Biscuits from which to estimate revenue growth.  Def. Mem. at 44-45 (arguing that "Hart relies solely" on a declaration that the company "hosted a few shows a year").

        "Most challenges to the facts or data relied upon by an expert do not go to the admissibility of his testimony, but only to the weight" thereof.  *Allen v. Dairy Farmers of Am., Inc.*, No. 09-cv-230, 2014 WL 266290, at *9 (D. Vt. Jan. 23,

2014) (quoting *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005)).  Here, Hart relied on adequate data (for gatekeeping purposes).  He had a sworn declaration from Grits' founder, Erika Lewis, who described audience growth over the relevant time period.  Lewis Decl. ¶¶ 5-9.  Lewis averred that from "2010-2012, Grits & Biscuits hosted a few shows a year at venues that held approximately 500 people."  *Id.* ¶ 5.  The company "grew steadily," and from "2013-2016, Grits & Biscuits hosted approximately 8-15 shows per year at venues with approximate capacities ranging from 900-1,500 people."  *Id.* ¶ 8.  Then, from "2016-2019, Grits & Biscuits hosted approximately 15-28 shows per year at venues with approximate capacities ranging from 1,200-4,500 people."  *Id.* ¶ 9.

Hart used these figures to estimate Grits & Biscuits' annual growth.  *See* Hart Report at 36 (Exh. 3b).  This does not warrant exclusion; "experts commonly extrapolate from existing data."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  To be sure, another expert might reach a different estimate.  But "under *Daubert*, the possibility that a different conclusion could be drawn from [] data does not undercut the reliability of the conclusion that was drawn, as long as the expert has good grounds for the chosen interpretation."  *United States v. Morgan*, 53 F. Supp. 3d 732, 741 (S.D.N.Y. 2014).

Hart explained the basis for his conclusion in some detail.  And Mowatt does not argue that the analysis is actually inconsistent with the data — only that the information from Grits & Biscuits was too "vague" to support Hart's gap-filling extrapolation.  Def. Mem. at 44.  But experts facing imperfect data sets regularly make "estimates based on reasoned judgment and professional training."  *Prob. Ct. of City of Warwick ex rel. Lawton*, 2010 WL 1508922, *5.  Mowatt may attack those estimates at trial, but they are not a basis on which to exclude Hart's testimony.

## II.    Conclusion

For these reasons, the defendant's motions are denied, except that count four of the complaint is hereby dismissed. Before October 21, 2024, the parties are directed to file a joint proposed pretrial order in accordance with the Court's Individual Civil Rules.  A pretrial conference will be held on

November 21, 2024, at 10:00 A.M., in person in Courtroom 6G

North.


       SO ORDERED.


                              /s/ Eric Komitee
                          ERIC KOMITEE
                          United States District Judge


Dated:      September 11, 2024
             Brooklyn, New York